**UNITED STATES of America,**
**Plaintiff,**

v.

**Joseph DI STEFANO, Defendant.**

No. 72–211 Cr. T.

United States District Court,
M. D. Florida,
Tampa Division.

July 5, 1973.

William James, Asst. U. S. Atty., for plaintiff.

Arnold D. Levine, Tampa, Fla., for defendant.

## MEMORANDUM

RICHARD E. ROBINSON, Senior District Judge.

This matter comes before the Court upon the motion of defendant, Joseph Di Stefano, for the entry of a Judgment of Acquittal, or in the alternative, for a new trial.

The defendant asserts, *inter alia*, the defense of double jeopardy. The defendant had previously been tried in the United States District Court for the Eastern District of Pennsylvania in March, 1972. There were two indictments involved in the Pennsylvania trial; the defendant was adjudged guilty of three counts of Indictment No. 71–460, each count a violation of 18 U.S.C. §§ 2 and 1341, and the defendant was adjudged guilty of four counts of Indictment No. 71–750; two counts were a violation of 18 U.S.C. §§ 2 and 1341, one count a violation of 18 U.S.C. § 1342, and one count a violation of 18 U.S.C. § 371. Sentences were imposed on each count of which the defendant was adjudged guilty.

On July 14th, 1972, an indictment was filed in the United States District Court for the Middle District of Florida charging the defendant with two counts; one count in violation of 18 U.S.C. § 1952 and one count in violation of 18 U.S.C. § 371.

The defendant made a pretrial motion to dismiss the Indictment on the grounds of double jeopardy and proffered the two Indictments [71–460 and 71–750] filed in the United States District Court for the Eastern District of Pennsylvania as well as a duplication of the Daily Copy of the trial proceedings conducted in the United States District Court for the Eastern District of Pennsylvania.

This motion was overruled and trial was held in the Middle District of Florida. Jury Verdicts of Guilty were returned on both counts of the Indictment.

The following statement is taken from the Government's brief submitted in opposition to the motions now before the Court:

"The offenses for which the defendant has been convicted in Philadelphia and Tampa arose out of the purchase and sale of voting machines and accessory equipment by Hillsborough County, Florida, from the Shoup Voting Machine Company during 1969–1970, and the payment of a $5,000 bribe to a former public official."

[Government's Brief Case No. 72–211–Cr.T–K, Filed 4/30/73 page 1].

Notwithstanding this statement the government argues there were two separate and distinct conspiracies. This is in part a factual issue. Here, as in Arnold v. United States, 336 F.2d 347 [9th Cir. 1964], it was stipulated that the factual issue of double jeopardy should be tried to the Court without a jury at the conclusion of the jury trial, and jury consideration of this issue was waived.

While the Indictments are different on the face, it is clear that the government has artificially divided the conspiracy and presented only certain aspects of the conspiracy in each indictment. The Pennsylvania indictment focuses on the use of the mails to further the conspiracy whereas the Florida Indictment focuses on the use of the telephone and interstate travel to further the conspiracy.

The following represents a portion of the opening statement made by the government in the Pennsylvania trial:

". . . Now, I will discuss briefly what the evidence is going to demonstrate to you occurred in the case. First, you will find that the subject or the victim of the fraud is not just a person but it is a whole county. Hillsborough County, Florida, which is Tampa, Florida. "What happened in Tampa, Florida is this: They use voting machines the same way I think most of the places where you vote do, certainly Philadelphia, and in 1968 the county determined that it was going to renovate the voting machines and by renovating what they were doing was having certain parts added to them that would make them usable for certain types of elections. The parts are called interlocks. They are very expensive parts and they are interchangeable and removable.

"You put an interlock on a voting machine, and if you ever want to take it off and put it on another voting machine you can, and the county spent $218,000 putting these interlocks on all its voting machines in 1968, and that $218,000 was spent, that is was paid to Shoup Voting Machine Corporation. That's who put the interlocks on the machines for them, Shoup.

"In 1969, just about a year later, the county determined that it was going to replace 200 of its voting machines, and all of those 200 voting machines had had this work done on them, had had these interlocks put on them, and the county bought new voting machines from the Shoup Voting Machine Corporation and sold its old voting machines on a trade-in.

"Now, when it sold the voting machines on a trade-in, it got two bids. One was for $25 a machine and one was for $30 a machine, and of the two bids they took the highest bid which was $30 a machine, and they sold their 200 machines or 180 old machines for a total of $5400. That's what the county got. $5400 was what it got for its machines, and these machines, when they were sold, had the interlocks on.

"In each case each machine had about $500 worth of interlocks on it, aside from the value of the machine itself, and what it was worth. The new interlocks that had just been put on each machine were on there when they were sold, and the machines were sold with the interlocks for $30 a machine and almost immediately were resold by Shoup to Houston, Texas, for $1500 a machine. So, although the county had received only $5400 for the machines, Shoup received over $150,000 for them when they resold them to Houston, Texas.

"On the machines that the county bought, the new machines, they bought new interlocks. Even though they had already had the old interlocks on the machines that could have been put on the new machines, they bought new interlocks, and the new machines cost them a total of $540,000, of which almost about $140,000 was for interlocks again, to replace the interlocks that they had already had and could have kept.

"Now, when the dust settles on all of this, you find that the result is that the county spent about $758,000. That's $540,000 for the new machines and $218,000 for the original interlocks in 1968. So that's about three-quarters of a million dollars cash money that the county, Tampa, Florida, spent to the Shoup Voting Machine Corporation.

"What the county got in return was $5400 for their old machines and machines that are basically the same as the ones they had before. They really don't wind up with anything much different than they already had, except that they are out three-quarters of a million dollars.

"The Shoup Voting Machine Corporation and John Womack, the defendant, who you will find worked for Shoup, was an agent of Shoup, and Mr. DiStefano who was also making money in the deal, as I will explain to you in a moment, among them, between getting the old machines for almost nothing

and selling the new machines with the new set of interlocks on them, they made a total between Houston and Tampa of $930,000; almost a million dollars. So Tampa lost three-quarters of a million, Houston, Texas spent about $150,000 and Shoup and Womack made about a million dollars and Tampa wound up with nothing really different than they ever had before.

"So, that is basically what happened and the next question that should be going through your minds is: Well, how did it happen? I mean, nobody just gives away three-quarters of a million dollars; nobody just spends three-quarters of a million for something they already have. How did it happen? Here is what the evidence is going to show.

"That the story—although these are 1968 and 1969 transactions—centers around Mr. DiStefano who is the second defendant here [indicating], and it goes back really to 1962. Back at that time DiStefano—who was then a member of the County Board of Eelections. He entered into an agreement with Shoup under a phony name, and the name that he used was Zabar Sales, Ltd., or Zabar Sales Company, and there really was no Zabar Sales Company. It was a fiction, non-existing company at that time. [Objection omitted].

"MR. OZER: So back in 1962 DiStefano and Shoup entered into what was really a phony contract. That Zabar Sales, a corporation that did not exist, represent Shoup to sell Shoup machines in Tampa, Florida.

"Shortly thereafter they actually formed, the company was formed so that there would be in fact a corporation called Zabar Sales and it was formed in the Bahamas and it was formed in the Bahamas because they could have a bank account there that could be secret and the only thing that that corporation ever did, from that day to this, back from 1962 and 1963 when it actually came into existence until this very day, there was never any business that it did; there were never any employees. The only thing it ever did was serve as a funnel or a straw party to clear checks because Shoup couldn't send the checks to DiStefano because he was a County Election Board Member. DiStefano didn't want anyone to know he was getting the checks, so Shoup would make out its checks to Zabar Sales, Ltd., and would send them not to DiStefano but —they would show as made out to DiStefano and DiStefano would then have them cashed and obtain the cash.

"Now, there was another person who was involved from those early days and who was always involved in the checks that went through Zabar Sales, and that's the defendant, Mr. Grimaldi. Mr. Grimaldi you will find was a lawyer, he was a bank president. He knew exactly how to set up this corporation; he knew exactly what it was for, and he knew how to handle money and bank accounts, and Grimaldi knew that DiStefano was an Election Board Member and knew that he had to conceal these checks from the Shoup Voting Machine Corporation.

"He went to the Bahamas, he set up this phony corporation, he had himself made the president of it, and every time a check came in—there was only about three checks from back in '62 up to the present—but each time a check came in, about $20,000, Grimaldi would take the check after DiStefano would give it to him and he would physically take that check to the Bahamas to the bank where the corporation had its account in the Bahamas, where it had its secret account, and he would cash the check in the Bahamas and he would bring the money back to DiStefano and he would take out about $1500 for himself for the price of cashing a check and Grimaldi did that for DiStefano and he made his cut out of this graft money that was going down to DiStefano.

"Now, in 1968 when these transactions which are the subject of this indictment begin that's the first thing that happens. When the county buys those first interlocks, $218,000, the first check, $20,000—you will see the check, we have it here, the check made out to

Zabar Sales, Ltd., the phony corporation, the paper corporation, the nonexistent corporation, that check goes down to Zabar Sales, $20,000. Grimaldi takes it, cashes it, gives the money to DiStefano.

"DiStefano, you will find, has been using the money and does use the money in 1968 to bribe officials in Florida. That is how he makes the sales. That is how they cause the officials in Florida to go into this bizarre transaction that costs the county three-quarters of a million dollars. "DiStefano takes that money, he pays off a County Commissioner, pays off the Chairman of the Election Board, and they use that money to effectuate or to cause the county to enter into these sales.

"Now, the defendant John Womack, he had a different role, John Womack represented Shoup Corporation all over Florida except in Tampa where Shoup dealt directly from its main office.

"Womack was a Shoup agent. Now, Womack had a corporation too. His corporation was called Southern Municipal Sales. He owns all the stock and it is his personal corporation and it is basically him.

"Now, when Shoup went to buy the old machines, they already knew they were trying to sell them for $1500 a machine, they had already had a representative from Houston, Texas come look at the machines in the Tampa warehouse negotiating the sale, but they arranged not just to submit their $25 bid because maybe the county would think that that looks awfully low, it is not very much for a big voting machine with interlocks, so Womack went in and he submitted the $30 bid under the name Southern Municipal Sales, and the county looks at the two bids; they look like two competitive bids. It looks like all you can get is $25 or $30 a machine. Well, you might as well take the highest bid, and they do, never knowing that meanwhile Shoup has been arranging to sell the machines for $1500 each; never knowing that the whole sale has gone through because DiStefano had passed the bribe money to the county officials, Never knowing any of these things, the county goes into this transaction that costs them all the money.

"You will find out the money Womack made on this was first when the interlocks were sold in 1968. The commission for the interlocks was paid not to Womack himself. He never takes the money himself. He never submits the bid himself. He deals through other names. Everyone always uses other names in the case.

"Womack received the commissions for that $218,000 sale under the name Woodrow George and William Womack. William Womack is his brother, and Woodrow George works for him. Then when the county bought the new machines that had the second set of interlocks on them to replace the perfectly fine new interlocks they had just gotten rid of, Womack made commissions on that again and again the checks went to Woodrow George and William Womack.

"Then, when Womack obtained the machines for Shoup for $30 each, Shoup gave him $500 for each machine because they were selling them for $1500, and 80 of the machines he was able to sell himself and the interlocks, he sold that to Shoup, and you will find out that Womack's share of this, the money that he made, aside from what Shoup made out of this almost million dollars, Womack himself got $186,907.20. Almost $200,000 was what Womack himself made out of the fleecing of Hillsborough County, Tampa, Florida.

"Now, in the 1969 transaction, you had these payments, to Zabar Sales, the money that DiStefano used to bribe the officials. In 1969 DiStefano was still going to bribe the officials and Shoup was still going to pay the bribe money, but the only thing that bothered DiStefano then you will find was that he didn't want Grimaldi getting his share. He was tired of paying Grimaldi $1500 a check just to cash a check. So, in 1969 DiStefano decided, and he told Shoup; Don't make the check out to Zabar Sales

any more. Make it out to Arturo Garcia and mail it to a certain post office box, and Shoup doesn't care. They will make the checks out to Mickey Mouse as far as they are concerned, as long as they make the sale.

"Well, it turns out there is no Arturo Garcia. A completely fictitious person, non-existent. The post office box that it was mailed to turns out to be the post office box of the defendant Dominick Reina sitting over there at the end [indicating]. Dominick Reina, you will learn, is an old friend of DiStefano, they have known each other for years, and he received the checks in his post office box under the name Arturo Garcia.

"The check was then endorsed Arturo Garcia, and there will be a handwriting expert here, a document examiner from the Internal Revenue Service, who will explain to you and show you carefully and with charts that the endorsement Arturo Garcia on those two checks of $20,000 each is the handwriting of Dominick Reina. He endorsed those checks, he is the one who put the fictitious names on the endorsements, Arturo Garcia, and then DiStefano, DiStefano himself took the checks into a bank where there is a teller he knows who was friendly with him, and the bank he went to was Grimaldi's bank, where Grimaldi was the president.

"He went to this teller and the teller cashed the checks for him because he knew the checks would clear and they did clear and DiStefano took that money and he used it once again for bribery. He paid the commissioners, he paid the County Election Board Chairman, and that's why the 1969 sale went through smoothly, and, in fact, after Womack got the machines with the old interlocks, DiStefano called back Shoup and he says: You know, we let those interlocks on there on purpose. We knew we had those valuable interlocks, we knew they were replaceable, we knew we could have used them on the new machines, but we left them there on purpose because we want some more money. We think we are entitled to a little more money.

"So, you can see the county never had a chance. Shoup, Womack, DiStefano, Grimaldi, Garcia or Reina, they had the county covered both ways. They had the officials bribed; they had the bids rigged. There was no way the county ever had a chance to avoid losing that money, and they made a fortune. They made a million dollars amongst themselves and the county got nothing.

Now, that is the fraud. We then come to the use of the mails. . . . ." [Def. Exhibit 3–Tr. 29–41].

Of course, the opening statement is not evidence, but it is revealing and the Court notes that the remainder of the transcript discloses that the government performed a commendable task of presenting the evidence which was outlined in the opening statement. It was in fact, startling to this Court to read the transcript of the Pennsylvania trial after having presided over the Florida trial. Significant portions of the trials were obviously very similar in nearly all material aspects, if the portions relating to the use of the mails were deleted and the evidence relating to the use of other interstate facilities were substituted in lieu thereof.

 "Mail fraud" and "interstate travel in and of racketeering" are separate and distinct offenses as defined by 18 U.S.C. § 1341 and 18 U.S.C. § 1952, but the number of substantive offenses committed is not determinative of whether more than one prosecution of a conspiracy is permissible. As stated in Braverman v. U. S., 317 U.S. 49–53, 63 S. Ct. 99, 101, 87 L.Ed. 23 [1942]:

"For when a single agreement to commit one or more substantive crimes is evidenced by an overt act, as the statute requires [predecessor to 18 U.S.C. A. § 371], the precise nature and extent of the conspiracy must be determined by reference to the agreement which embraces and defines its objects. Whether the object of a single agreement is to commit one or many crimes, it is in either case that agreement which constitutes the conspiracy

which the statute punishes. The one agreement cannot be taken to be several agreements and hence several conspiracies because it invisages the violation of several statutes rather than one."

The language just quoted from *Braverman, supra,* was also cited in United States v. Mori, 444 F.2d 240, 244 [5th Cir. 1971] in support of that court's determination that:

"Even though the conspiracy charged here envisioned the violation of several substantive provisions, including 18 U.S.C.A., § 1952 and 21 U.S.C.A. § 174, it was a single agreement which constituted a single offense subject to a single punishment. See generally Youst v. United States, 5 Cir. 1945, 151 F.2d 666."

█ Prior to the trial I concurred with the denial of the motion to dismiss on the grounds of double jeopardy I now, however, have had the opportunity to hear the evidence presented at the second trial in the Middle District of Florida [which obviously was then unavailable] and have compared it with the first trial in the Eastern District of Pennsylvania. It is now my opinion after a careful comparison of the indictment and transcript of the trial in the Eastern District of Pennsylvania with indictment and the evidence presented in the Middle District of Florida that the conspiracy charged pursuant to 18 U.S. C. § 371 in Count V of Indictment No. 71–750 and the conspiracy charged pursuant to 18 U.S.C. § 371 in Count I of Indictment No. 72–211 [Cr.T–K] constitute the same, single and indivisible conspiracy. Thus the defendant has been twice tried for the same crime, based on the law and the evidence with respect to Count I of the Indictment.

Count II, however, represents a violation of 18 U.S.C. §§ 1952 and 2, a separate substantive offense. According to the concurring opinion of Justice Brennan in Ashe v. Swenson, 397 U.S. 436, 453–454, 90 S.Ct. 1189, 1199, 25 L.Ed.2d 469 [1970]:

"[T]he Double Jeopardy Clause requires the prosecutor, except in most limited circumstances, to join at one trial all the charges against a defendant that grow out of a single criminal act, occurrence, episode, or transaction. [Footnotes omitted]."

If this Court applied the view of Justice Brennan to the present case then the conviction under Count II would also be barred by the Double Jeopardy Clause.

█ However, that was not the opinion of the majority and under the older "same evidence" or "same offense" test it appears that Count II required proof of certain facts not required by the other counts in the previous trial. See Hattaway v. United States, 399 F.2d 431 [5th Cir. 1968]; Dryden v. United States, 403 F.2d 1008 [5th Cir. 1968] and United States v. DeMarrias, 441 F. 2d 1304 [8th Cir. 1971].

The defendant asserts another issue which is independent of the double jeopardy issue. It is the defendant's position that the recent Florida case of Nell v. State [Filed 4/11/73] 277 So.2d 1 [Fla. 1973], holds that the bribery statute in question, Florida Statute 838.011, encompasses only prospective actions of public officials that are classified as an *official* act, vote or behavior. Assuming, without deciding, that this interpretation of *Nell, supra,* is correct it does not follow in this present action that the defendant is entitled to a judgment of acquittal on Count II.

There was evidence adduced at the trial that Martin Schott had been in communication on several occasions with Ronald Budd prior to the recommendation of the Election Board on April 8, 1969 [to include $420,000.00 in the budget for the purchase of the voting machines]. Ronald Budd signed the recommendation in his capacity as Chairman [Government Ex. 26]. There was testimony that the Election Board duties included the duty of making such a recommendation. Thus it is clear that some

*official* act, vote or behavior was performed by Ronald Budd.

█ It does not follow that the payment did not constitute the crime of bribery, as defined by Florida Statute 838.011, simply because the payment of money followed the official actions in time, or may also have been to influence, in part, some other unofficial actions. The evidence in this action is sufficient to establish a nexus with the official action and the payment of money, and thus the evidence is sufficient to establish the crime of bribery in this case.

█ The acquittal of the conspiracy raises the issue of whether it is proper to allow the conviction of the substantive Count II to stand. United States v. Palmiotto, 347 F.2d 223, [2nd Cir. 1965] held that:

"It was not inconsistent for the trial judge to acquit defendant on the conspiracy count while convicting him on the substantive counts." Accord Ehrlich v. United States, 238 F.2d 481 [5th Cir. 1956].

█ The Court has also carefully and fully considered the possible prejudice to defendant DiStefano which may have resulted from the joint trial of the Conspiracy Count and the Substantive Count.

In United States v. Catino, 403 F.2d 491 [2nd Cir. 1968] the conspiracy count was dismissed prior to submission of the substantive counts to the jury. The defendant argued that prejudice resulted from the admission of evidence on the conspiracy count. The court held that the Court's limiting instructions to the jury were effective, and affirmed the judgment of conviction. *Cf.* Schaffer v. United States, 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921 [1960].

The jury was instructed in the present case to give separate consideration to each count and the evidence pertaining thereto and to give separate consideration to each defendant. There were only two defendants and two counts in the action. The jury was also given a limiting instruction with regard to evidence admitted with respect to the Conspiracy Count.

The jury's ability to follow the instructions and give separate consideration was demonstrated by the jury's verdict of acquittal for the co-defendant.

The Court has fully considered all of the remaining reasons asserted by the defendant and has concluded that a sufficient and proper basis has not been demonstrated which would justify the granting of either of the motions with respect to Count II.

Separate Orders will be entered.