**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Keith ANDERSON, Byron Carlisle,**
**Defendants-Appellants.**

No. 85–5869.

United States Court of Appeals,
Eleventh Circuit.

May 23, 1989.

Laurel White Marc–Charles, Miami, Fla. (Court-appointed), for Anderson and Carlisle.

Dexter W. Lehtinen, U.S. Atty., Lawrence H. Sharf, Linda C. Hertz, Lynne Lamprecht, Asst. U.S. Attys., Miami, Fla., for U.S.

Before RONEY, Chief Judge, COX, Circuit Judge, and MORGAN, Senior Circuit Judge.

MORGAN, Senior Circuit Judge:

Appellants Keith Anderson and Byron Carlisle were convicted on three separate conspiracies and eight substantive charges arising from an unauthorized removal from Fort Bragg, North Carolina and unlicensed transfer of a variety of military armaments and explosive devices. On appeal, appellants challenge these convictions on numerous grounds. The principal issues raised by appellants concern the exclusion of classified information in their defense that their actions were taken in reasonable good faith reliance on the apparent authority of a purported agent of the Central Intelligence Agency ("CIA"), and the imposition of consecutive sentences upon multiplicitous conspiracy counts. We vacate the sentence imposed and remand for resentencing, and otherwise affirm. We address only those issues that merit discussion.

## I. BACKGROUND

In an eleven-count superseding indictment filed in the Southern District of Florida on October 16, 1985, appellants were charged with various federal violations involving firearms and explosives. In summary, appellants were each charged in ten counts as follows: I, II, and III, conspiracies to possess unregistered firearms, to transfer unregistered firearms, and to sell property of the United States, respectively, in violation of 18 U.S.C. Sec. 371; IV and V, possession and transfer, respectively, of firearms on August 24, 1984, and VII and VIII, possession and transfer, respectively, of firearms on October 6, 1984, all in violation of 26 U.S.C. Sec. 5861(d), (e); VI, unauthorized sale of government property on August 24, 1984, and IX, unauthorized sale of unregistered firearms on October 6, 1984, all in violation of 18 U.S.C. Sec. 641;

and XI, knowingly engaging in the business of dealing in explosive materials without a license, in violation of 18 U.S.C. Sec. 842(a)(1). Additionally, appellant Anderson was charged in Count X with carrying a concealed unregistered weapon during the commission of a felony on October 6, 1984, in violation of 18 U.S.C. Sec. 924(c)(2).

Appellants filed a pretrial motion to dismiss Counts I, II and III. Each count charged conspiracies concerning the same time frame, alleging the same overt acts in furtherance thereof, but claiming that each had a separate criminal object. This motion was denied.

The government requested by motion that a pretrial conference be set in order to consider matters relating to the possible disclosure of classified information at trial. The government also filed a motion *in limine* to preclude assertion of an "apparent authority" or "CIA" defense, to which the appellants responded. Appellants filed formal notices of their intention to disclose classified information, pursuant to the Classified Information Procedures Act ("CIPA"), 18 U.S.C.App. Sec. 5(a). The government moved pursuant to Section 6(a) of CIPA for an *in camera* hearing to consider the use, relevancy and admissibility of classified information. After a two-day hearing, District Judge Norman C. Roettger, Jr. determined that the classified information was irrelevant and could not be disclosed at trial. Motions for continuances on the eve of the CIPA hearing and trial were denied.

On July 22, 1985, a one-week jury trial began before a visiting district judge.[1] Thereafter, the case was submitted to the jury, and verdicts of guilty to all charges were returned as to each defendant. Appellants were each sentenced to incarceration for 40 years and were each ordered to pay $13,076.13 restitution to the United States Army.[2] This appeal followed.

---

1. Honorable Anthony Alaimo, Southern District of Georgia, sitting by designation.

2. Appellant Carlisle was found guilty of all counts in the indictment, except Count X, in which he was not charged. Appellant Anderson was found guilty of all eleven counts in the indictment. Anderson was sentenced as follows: Count I, 5 years; Counts II and III, 5

years each, to run concurrently with each other, but consecutively to Count I; Counts IV, V, and VI, 10 years each to run consecutively to each other, and consecutively to Counts I, II and III; Counts VII, VIII, IX, X and XI, 10 years each to run concurrently with each other and concurrently with Counts I–VI. The restitution was ordered to be paid not later than 5 years following his release from incarceration. Carlisle was

## A. Government's Evidence at Trial

The government's case was presented almost entirely through the testimony of Special Agent Fredrick L. Gleffe of the Bureau of Alcohol, Tobacco and Firearms ("ATF"), and the videotapes and audiotapes introduced during that testimony. The government's evidence at trial established that the appellants, Sergeant First Class Keith Anderson and Sergeant First Class Byron Carlisle, both of whom were members of the Special Forces of the United States Army stationed at Fort Bragg, North Carolina, conspired with other unknown military personnel to steal high explosives and other military supplies from Fort Bragg and to sell this material to undercover government agents and an informant posing as narcotics distributors and dealers in stolen property. Pursuant to this conspiracy, the appellants made multiple transfers to the agents of large quantities of items such as Claymore antipersonnel mines, M–67 hand grenades, C–4 plastic explosives, T.N.T., dynamite, 35 mm. practice L.A.W.S. rockets, detonation devices, and tons of ammunition and other military supplies, including large shells such as 106 mm. and 90 mm. canisters. The government also presented evidence that appellants provided and offered to provide assistance to undercover agents in their purported activity as drug distributors.

In November 1982, following an arrest for attempting to sell two silencers to undercover ATF agents, Richard Flaherty agreed to cooperate with the government. Flaherty had once been with the Special Forces and, at the time of his arrest, was a captain in the Army Reserves. Flaherty later told ATF agents that during his last two-week period of active duty in July 1982, he had met appellant Anderson who offered to supply him with munitions from Fort Bragg. In July 1984, Agent Gleffe decided to pursue this lead and instructed Flaherty to reinitiate contact with Anderson. Agent Gleffe adopted the undercover name "Griff," and assumed the role of a narcotics smuggler and distributor of stolen property.

On August 14, 1984, Flaherty introduced "Griff" to Anderson at a motel in Fayetteville, North Carolina.[3] Later the same day, Anderson delivered to them 196 pounds of military high explosives and accessories, together with a written inventory, in return for $3,200 cash. Both then and at subsequent meetings, Anderson described his unnamed "partner," but the agents did not actually meet Byron Carlisle until September 11, 1984.

At the August 14, 1984 meeting, Agent Gleffe expressed a special interest in acquiring Claymore mines and fragmentation grenades. At a later meeting, Anderson agreed to deliver thirty grenades and thirty Claymore mines when he was in Key West, Florida, on military business. On August 24, 1984, Anderson delivered thirty M–67 grenades and six Claymore mines from Fort Bragg to Gleffe in a Key West hotel room in exchange for $27,000 in cash; the other twenty-four Claymore mines were left behind in Fayetteville. The delivery and payment were recorded on videotape.

Following several further recorded telephone conversations, Agent Gleffe and Flaherty again met with Anderson at a Fayetteville motel on September 10, 1984. Anderson had the twenty-four remaining Claymore mines and a case of ammunition in his vehicle, but Gleffe arranged instead for a later delivery in Jacksonville, Florida. Thereafter, Anderson showed the agents the warehouse which he and his partner had rented in the name of their corporation, C–MAC, to store the military supplies.

On September 11, 1984, at the motel in Fayetteville, Anderson for the first time introduced the undercover agents to his partner, appellant Byron Carlisle. The parties planned to make a large exchange in the future of one kilogram of cocaine for $27,000 in military ordnance. The appellants explained, however, that cash also

---

sentenced in exactly the same fashion as Anderson, except that the sentences on Counts II and III were to run consecutively to each other and concurrent with Count I, and he was not sentenced for Count X.

3. This meeting and all of the subsequent meetings in this case were taped, either via a body bug worn by Flaherty or Agent Gleffe, or by use of a NAGRA recording device.

was needed so that necessary payments could be made to other military personnel for their connivance in procuring munitions. Carlisle acknowledged that Anderson had advised him of his previous transactions with the agents. The meeting ended with an agreement to transfer the Claymore mines and ammunition in Jacksonville.

On September 15, 1984, in a Jacksonville motel, Anderson delivered to Agent Gleffe the twenty-four Claymore mines and a case of tracer ammunition in return for $6,000 cash. The transaction was recorded on videotape. At this time, Anderson said that a drug distribution network was almost in place at Fort Bragg, and plans were made to exchange drugs for munitions in early October.

Agent Gleffe and another agent met with Anderson and Carlisle in Fayetteville on September 26, 1984, to make preparation to trade a large quantity of high explosives and office supplies for one kilogram of cocaine and approximately $27,000 cash. The appellants again explained that cash was needed to pay military personnel to procure additional explosives from Fort Bragg. The agents were taken to the warehouse a second time, which on the previous visit had been almost empty, but now held a large quantity of office supplies, as well as crates of blank ammunition and military goods.

On October 6, 1984, Anderson drove a rented truck to Vero Beach, Florida, carrying over two tons of military ammunition and explosives. Anderson gave Gleffe an accurate written inventory itemizing an approximate value of almost $50,000.[4] In exchange, Anderson received one kilogram of fake cocaine and $27,000 cash. After the transaction was completed, Anderson was placed under arrest. A loaded .380 pistol was seized from Anderson's shoulder bag. Carlisle was contemporaneously arrested in Fayetteville, where he had remained.

### B. The Appellants' Testimony at Trial

Appellant Keith Anderson testified at trial that, as a member of the Special Forces, he had been trained in guerilla warfare, covert operations, demolitions, communications, and the use of American and foreign weapons. Anderson explained that Special Forces personnel also train foreign armies in such tactics and may work with both civilian and military intelligence agencies.

In July 1982, Anderson met Flaherty, a Captain in the Special Forces Reserves, during Flaherty's two-week period of active duty. Anderson averred that Flaherty described himself as an "international arms merchant." Flaherty also told him that he worked with the CIA and was involved in clandestine and covert operations within Central America. According to Anderson, Flaherty called him eight to ten times in the ensuing two years. In August 1984, Flaherty told him that arms were needed "for covert operation, especially in El Salvador and Honduras," and because of political sensitivity, such arms could not be traced back to that agency.[5]

Anderson testified that Flaherty advised him that an individual whom he identified as "Griff," an entrepreneur and "drug merchant," would be providing the funding for this venture, and did not know and would not be advised of the true purpose of this operation. Instead, he would be advised that these munitions were for "drug operations." Thus, if detected, all those involved in this venture would appear to have engaged in criminal activity involving drugs, rather than an illegal CIA-orchestrated covert operation. Accordingly, Anderson testified that all discussions about narcotics in which Anderson engaged were a "lie" and "cover story" induced by Flaherty's deception.[6]

---

**4.** The parties stipulated that all munitions came from government stockpiles at Fort Bragg, and that Carlisle had written a portion of the inventory seized from the truck. In addition, the government introduced documents showing that appellants had requisitioned the munitions at Fort Bragg.

**5.** On cross-examination, Anderson maintained that he thought the munitions were being sent to the "contras," the U.S.-backed anti-Sandinista troops in Nicaragua.

**6.** According to Anderson, Flaherty promised him a promotion for assisting in this operation. Flaherty claimed to have powerful friends in Washington, and also promised to assist Car-

Anderson also testified that he initially did not advise Carlisle of this matter, but did so later because "Flaherty told me I would need somebody trustworthy and competent who had extensive intelligence background for covert operations." Anderson contended that the money he received for transferring munitions was used entirely to purchase explosives and related supplies and expenses.

On cross-examination, Anderson acknowledged that he did not advise the military chain of command of this approach, did not check whether this was a government operation, and sought no approval for his participation except from Flaherty. He maintained that as a member of the Special Forces trained to work with government agencies, one follows instructions by other U.S. intelligence agents not to report contacts to his superiors, and Flaherty furnished such directions.[7]

Byron Carlisle testified that he had received special training in weapons, intelligence and medical care, and taught clandestine communications, guerrilla warfare, and other topics. From December 1982 until early 1984, when he was officially removed from the project, Carlisle traveled back and forth to Honduras on a covert operation, the subject matter of which is largely classified. In the summer of 1984, Carlisle described himself as being in a "state of suspended animation" between projects under Anderson's command.[8] Carlisle claimed that he had been interviewed in a hotel and accepted for a covert project under similar conditions, so he had not questioned it. Carlisle averred that he did not ask Flaherty for identification because,

in his prior hotel interview with the CIA, he had been instructed not to do so.

Carlisle acknowledged signing for the removal of ammunition at Fort Bragg, but maintained that he did not intentionally participate in a theft. Based on the subsequent conversations with Anderson, Carlisle testified that he believed that a shipment had been approved through proper channels to Flaherty at a Special Forces unit of the National Guard. According to Carlisle, his extensive discussions of illegal activity were role playing pursuant to the cover story maintained by Anderson. He denied that he would ever participate in taking ammunition illegally, but conceded that he had offered other military personnel money for the munitions. Carlisle denied that he had any contact with the munitions after he delivered it to Anderson inside Fort Bragg.

## II. APPARENT AUTHORITY DEFENSE

The most serious challenge on appeal revolve around the district court's rulings at the CIPA hearing and the trial relating to the so-called "apparent authority" or "CIA" defense. The thrust of appellants' defense was that they reasonably relied upon the apparent authority of Flaherty acting as a CIA agent to engage them in a covert activity. Appellants contend that the district court erred in excluding use of classified material at trial because such evidence was relevant to their defense. Moreover, appellants contend that the district court erred in instructing the jury that "apparent authority" was not a defense to these charges.

---

lisle's son with a disciplinary problem in the military.

**7.** In rebuttal, the government produced two witnesses, Major Eugene E. Makowski, Chief of Operations for the Army First Operation Command at Fort Bragg, and James V. West, an Army Special Forces Officer at Fort Bragg. They testified that, as all personnel are instructed, every contact by a civilian or military U.S. intelligence agency must be reported to the chain of command, and participation in covert operations may only be authorized by and through normal channels. Anderson also asserted that Flaherty told him that the CIA does

not show identification. West and Makowski, however, testified that such identification is required before a Special Forces Officer may even speak with a purported intelligence agent. Additionally, Major Makowski testified that only a superior officer within the chain of command can give orders, and that Flaherty was not within either appellant's chain of command. Moreover, he testified that an officer in the Reserves has no authority except when he is on active duty.

**8.** Major Makowski testified that Anderson and Carlisle were in separate units and, thus, Anderson could not give commands to Carlisle.

Specifically, appellants argue that the excluded classified information would have substantiated their reasonable belief that they were participating in a government-sanctioned activity, by the similarities and interrelationships of one classified, covert activity to the facts of this case. Appellants contend that the excluded evidence bore directly upon their state of mind, and therefore their specific intent, which was an essential element of each charge in the indictment. Appellants further argue that the district court's instruction to the jury— that appellants' good faith reliance upon the apparent authority of another was no defense to these charges—effectively directed a verdict in favor of the government on the element of specific intent. Appellants submit that the district court's errors deprived them of their constitutional right to adduce facts and present a complete defense.

### A. The CIPA Hearing

In order to properly understand the issues before this court, we should review CIPA and the legislative history surrounding it. CIPA was enacted by Congress in an effort to combat the growing problem of greymail, a practice whereby a criminal defendant threatens to reveal classified information during the course of his trial in the hope of forcing the government to drop the criminal charge against him. *United States v. Smith,* 780 F.2d 1102, 1105 (4th Cir.1985). Prior to the enactment of CIPA, the government had no method of evaluating such disclosure claims before trial actually began. *Id.* Oftentimes, this situation required the government to abandon prosecution rather than risk possible disclosure of classified information. *Id.*

CIPA established a procedural framework for ruling on questions of admissibility involving classified information before introduction of the evidence in open court. *See* S.Rep. No. 823, 96th Cong.2d Sess. at

1, *reprinted in* 1980 U.S.Code Cong. & Admin.News 4294. Section 5(a) of the Act requires defendant to give notice to the United States and the court if he reasonably expects to disclose classified information during his trial or during a pretrial proceeding. Once the defendant gives notice of his intention to introduce classified material, Section 6(a) permits the government to request an *in camera* hearing at which the court shall determine the "use, relevance, or admissibility" of the proposed information. 18 U.S.C.App. Sec. 5(a), 6(a).

■ The legislative history is clear that Congress did not intend to alter the existing standards for determining relevancy and admissibility of evidence. *Smith,* 780 F.2d at 1106 (citing H.R.Conf.Rep. No. 1436, 96th Cong.2d Sess. at 12, *reprinted in* 1980 U.S.Code Cong. & Admin.News 4307, 4310). The circuits that have considered the matter agree that ordinary rules of evidence determine admissibility under CIPA. *See, e.g. United States v. Wilson,* 750 F.2d 7 (2d Cir.1984); *United States v. Wilson,* 732 F.2d 404 (5th Cir.), *cert. denied,* 469 U.S. 1099, 105 S.Ct. 609, 83 L.Ed.2d 718 (1984). Accordingly, no new substantive law was created by the enactment of CIPA. *United States v. Collins,* 720 F.2d 1195, 1199 (11th Cir.1983).

In conformity with the Act, the district court conducted an *in camera* hearing prescribed by Section 6(a) of CIPA in order to determine the admissibility of classified information which the defense sought to disclose at trial. At the conclusion of the hearing, Judge Roettger ruled that the classified information was inadmissible pursuant to Federal Rules of Evidence 401 and 403.[9] The court acknowledged that the CIPA statute required him to determine the use, relevance and admissibility of the classified information using ordinary evidentiary principles. The district judge concluded that the classified material relating

---

**9.** Fed.R.Evid. 401 states: " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

Fed.R.Evid. 403 states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence."

to a prior covert operation was irrelevant to the charges against appellants in the indictment. After finding the classified items irrelevant, Judge Roettger ruled in the alternative that the evidence should be excluded under Rule 403 because of "the risk of confusion of the jury," noting that the matter struck him as "purely and simply a red herring."

The court further observed that, although it left the matter to the ultimate decision of the trial judge, it was persuaded by *United States v. Wilson,* 721 F.2d 967 (4th Cir.1983), and *United States v. Duggan,* 743 F.2d 59 (2d Cir.1984), that apparent authority is not a valid defense to a violation of the law. The court found the asserted need for disclosure of classified information here "just a straight simple pretext ... classic examples of greymail and the reason CIPA was enacted." The defense could be satisfactorily raised, according to the district court, with unclassified information if the trial judge thought it relevant. Finally, the court commented that in light of Carlisle's testimony and on the record thus far developed, an apparent authority defense did not appear to be tenable under any view of the law.

## B. *Discussion*

The trial court is vested with broad discretion in ruling upon the relevancy and admissibility of evidence. *United States v. 110 Bars of Silver, 3 Crucibles of Silver, 11 Bags of Silver Coins,* 508 F.2d 799, 802 (5th Cir.), *cert. denied,* 423 U.S. 861, 96 S.Ct. 118, 46 L.Ed.2d 89 (1975); *see Hamling v. United States,* 418 U.S. 87, 124–27, 94 S.Ct. 2887, 2911–12, 41 L.Ed.2d 590 (1974). Its ruling will not be disturbed on appeal in the absence of clear abuse of that discretion. *United States v. Russell,* 703 F.2d 1243, 1249 (11th Cir.1983). Such discretion does not, however, "extend to the exclusion of crucial relevant evidence necessary to establish a valid defense." *Unit-*

ed *States v. Wasman,* 641 F.2d 326, 329 (5th Cir. Unit B 1981) (citing *United States v. Riley,* 550 F.2d 233, 236 (5th Cir.1977)). Before considering whether the exclusion of evidence in support of a defense was an abuse of discretion, we must first determine that the proffered defense was valid.

Recently, this court considered the validity of the so-called "CIA" or "apparent authority" defense in *United States v. Rosenthal,* 793 F.2d 1214, 1235–37 (11th Cir. 1986), *cert. denied,* 480 U.S. 919, 107 S.Ct. 1377, 94 L.Ed.2d 692 (1987). The defendants there were led to believe by someone whom they allegedly thought was a CIA agent, "that their drug smuggling activities were part of an intelligence operation undertaken in pursuit of national security objectives." *Id.* at 1235. They contended that the district court erred in limiting their proposed evidence regarding the "CIA defense" and in rejecting a proposed instruction which set forth this defense. This court followed *United States v. Duggan,* 743 F.2d 59, 83–84 (2d Cir.1984), in holding that since "ignorance of the law or mistake as to the law's requirements is not a defense to criminal conduct," [10] a "defendant may only be exonerated on the basis of his reliance on real and not merely apparent authority." 793 F.2d at 1235 (citing *Duggan,* 743 F.2d at 83). Because the CIA had no real authority to authorize such violations of law, the defendant's theory "that they were acting on apparent authority of a CIA agent is not a viable defense." *Id.* at 1236. Accordingly, the court found that the trial court did not err in limiting the evidence or in refusing to instruct the jury on this defense. *Id.*

In *Duggan,* the defendants were convicted of unlicensed exportation of munitions and of various firearm offenses. The defendants contended that their actions were taken in reasonable good faith reliance on the apparent authority of a government

---

10. The *Duggan* court recognized a few limited exceptions to the mistake of law rule:

There is an exception for legitimate reliance on an official interpretation of law. *See, e.g., Cox v. Louisiana,* 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965); *United States v. Mancuso,* 139 F.2d 90 (3d Cir.1943). There is also an

exception for responding to a police officer's call for assistance in making unlawful arrests or searches. *See People v. Weiss,* 276 N.Y. 384, 12 N.E.2d 514 (1938).

743 F.2d at 83. The court found, however, that the traditional exceptions had no application to the case.

informant to act as an agent of the CIA. The trial court refused to give the requested instruction of apparent authority. In upholding the district court's refusal to give the instruction, the court found that the mistake advanced by defendants as an excuse for their criminal activities—their reliance on the informant's purported authority—"is an error based on a mistaken view of legal requirements and therefore constitutes a mistake of law." 743 F.2d at 83 (citing *United States v. Barker*, 546 F.2d 940, 946 (D.C.Cir.1976).

▆▆▆ In this case, there is no serious contention advanced by the appellants that a CIA agent possessed actual authority to approve exceptions to the laws regulating possession, registration and transfer of high explosives and other munitions, or to legally authorize theft of military property for the use of foreign factions. Officials of the CIA or any other intelligence agency of the United States do not have the authority to sanction conduct which would violate the Constitution or statutes of the United States, including the laws under which appellants are charged here. *See Rosenthal*, 793 F.2d at 1236 (citing Exec. Order No.

12333, 3 C.F.R. 200 (1982)). Because the CIA had no real authority to violate the statutes of the United States, appellants' theory that they were acting on apparent authority of an alleged CIA agent is not a viable defense.[11] In light of *Rosenthal*, we conclude that the district court properly exercised its discretion in excluding evidence offered by the defense which, if believed, fails to establish a legally cognizable defense.[12]

Appellants argue that when a defendant based his actions upon a mistake of fact, as opposed to a mistake of law, this circuit has recognized that such a defense is valid. According to this view, a "mistake of fact" defense is really but another way of stating that a defendant lacks criminal intent, and thus must be permitted. *See United States v. Juan*, 776 F.2d 256 (11th Cir.1985) (where this court held that defendant made sufficient showing of materiality with respect to request under CIPA for documents which would show that he had at one time had a relationship with the government, thus making his belief that he was cooperating with the government at the time of the offense reasonable).

---

**11.** As Judge Roettger recognized, appellants could not be exonerated under any view of the scope of the "apparent authority" defense. The most expansive view of that defense, which was explicitly rejected in *Rosenthal*, is set forth in Judge Wilkey's individual opinion in *United States v. Barker*, 546 F.2d 940 (D.C.Cir.1976). Under that view, to avail himself of the defense, defendant must "show *both* (1) facts justifying their reasonable reliance on [the purported official's] apparent authority and (2) a *legal* theory on which to base a reasonable belief that [the official] possessed such authority." *Id.* at 949 (emphasis in original). Since appellants did not advance an adequate legal theory under which they reasonably believed that their conduct was lawfully authorized, any evidence presented to justify their conduct would fall short of this standard. Moreover, Judge Wilkey emphasized that the mistake must be "*objectively reasonable* under the circumstances." *Id.* at 947–48 (emphasis in original). Judge Wilkey further suggested that government officials should be held to a much higher standard than private citizens "with regard to their ability and authority to judge the lawfulness of a particular governmental activity." *Id.* at 948–49. The evidence in the record does not provide an adequate factual basis for a defense of objectively reasonable reliance on apparent authority. As stated in *United States v. Wilson*, 721 F.2d 967, 975 (4th

Cir.1983), recognition of a good faith defense on a flimsy factual basis "would grant any criminal *carte blanche* to violate the law should he subjectively decide that he serves the government's interest thereby. Lawbreakers would become their own judges and juries." *See United States v. Kelly*, 556 F.2d 257, 266 n. 7 (5th Cir.1977) (where the court declined to rule on the validity of the *Barker* defense, but assumed defendant failed it because he did not prove the second prong of Judge Wilkey's test—a legal theory).

**12.** Likewise, the details of any alleged activities based upon an invalid defense should be excluded because they are irrelevant as a matter of law to the charges in the indictment. The exclusion of evidence such as the appellants' proffered "CIA defense" is consistent with the Supreme Court's decision in *United States v. Bailey*, 444 U.S. 394, 100 S.Ct. 624, 62 L.Ed.2d 575 (1979). In *Bailey*, the Supreme Court noted that a jury should not be burdened with testimony regarding a defense where that defense has already been determined to be legally insufficient. *Id.* at 416–17, 100 S.Ct. at 637–38. The court stated that such an approach "is a testament to the importance of trial by jury and the need to husband the resources necessary for that process by limiting evidence in a trial" to that which is legally sufficient. *Id.* at 416, 100 S.Ct. at 637–38.

In this case, appellants contend that they believed, albeit mistakenly, that their unauthorized removal and unlicensed transfer of a variety of military armaments and explosives was for and to an agent of the CIA as part of a classified operation in which one of them recently participated. As such, appellants submit that their mistake was factual in nature which served to negate criminal intent. If the appellants' mistake of fact had been true, according to appellants, this transfer, and their concomitant possession, of the munitions would be exempt under 18 U.S.C. Sec. 925(a)(1):

> The provisions of this chapter shall not apply with respect to the transportation, shipment, receipt, or importation of any firearm or ammunition imported for, sold or shipped to, or issued for the use of, the United States or any department, agency, or political subdivision thereof.

We initially note that appellants' reliance on Section 925(a)(1), which provides that the "provisions of this chapter" do not apply to sales or transfers to any agency of the United States, is misplaced. Assuming for the moment that the purported CIA-orchestrated diversion of arms to the "contras" would qualify as an exemption under Section 925(a)(1), appellants were not charged with any violation under that chapter (Chapter 44—Firearms), with the exception of Count X charging Anderson with carrying a firearm during the commission of a felony. Instead, appellants were charged with violations of 26 U.S.C. Sec. 5861(d), (e), 18 U.S.C. Sec. 842(a)(1), and 18 U.S.C. Sec. 641. Appellants do not cite any authority which supports their proposition that Section 925(a)(1) should be broadly interpreted.[13] Accordingly, we find the exemption under that section inapplicable to the charges in this case.

Regardless of whether we characterize appellants' mistake as one of law or fact, we find no merit in appellants' contention that the trial court's exclusion of classified material and jury instruction on apparent authority effectively directed a verdict in favor of the government on the element of criminal intent. Appellants' claim of innocent intent was adequately raised without the classified material. We note that, despite the CIPA ruling, appellants remained free to claim that they thought Flaherty was a CIA operative and that their actions were part of a government-sanctioned operation. At trial, the defense presented testimony that Carlisle had been engaged in a covert and classified operation in Honduras involving the training of armed forces. The jury learned that both appellants held security clearances, and they had received training and experience in sensitive matters, including matters involving relationships with civilian and military intelligence agencies. Appellants were permitted to testify that they had been trained to conceal contacts with intelligence agencies from their superiors when so instructed, although prosecution witnesses refuted this claim. Carlisle was also allowed to testify to his "similar" experiences in being recruited in a hotel room for the mission in Honduras. The prosecution at trial never challenged the fact that these Special Forces sergeants had been trained and had participated in matters involving national security and covert operations. The minutiae of the classified material added little, if anything, to the plausibility of their claim.

The question of intent was put squarely to the jury and resolved against appellants. *See United States v. Durrani*, 835 F.2d 410 (2d Cir.1987). The district court properly instructed the jury that government intelligence agents could not authorize violations of the law, so that it was not a defense that the defendants relied upon apparent authority of an agent to violate the law. On the other hand, the jury was charged that it should acquit unless it was satisfied beyond a reasonable doubt that the defendants acted with specific intent to violate the law, and that the defendants should be exonerated if the jury entertained a reasonable doubt whether the defendants acted in good faith under the

---

13. The court in *United States v. Clegg*, 740 F.2d 16 (9th Cir.1984), which addressed only a CIPA discovery issue, merely alluded to a "possible defense" by an individual charged with exporting firearms, in violation of 18 U.S.C. Sec. 922(a)(1) and 22 U.S.C. Sec. 2778(b)(2) and (c), citing as an example 18 U.S.C. Sec. 925(a)(1).

sincere belief that their activity was exempt from the law.[14] We find that these instructions were not in error, "plain" or otherwise. *See* Fed.R.Crim.P. 30.

After a careful review of the record, including the examination of the classified materials, we conclude that the trial court acted well within its discretion "to exclude irrelevant, confusing and misleading evidence." *United States v. Jordan*, 627 F.2d 683, 686 (5th Cir.1980). We emphasize that even relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury ..." in accordance with Federal Rule of Evidence 403. As courts considering CIPA issues have noted, the fact that a defendant's prior connection with covert activities may be relevant does not mean that the details of those activities are admissible under Rule 403. *See United States v. Wilson*, 750 F.2d 7 (2d Cir.1984), *cert. denied*, 479 U.S. 839, 107 S.Ct. 143, 93

L.Ed.2d 85 (1986), *aff'g* 586 F.Supp. 1011 (S.D.N.Y.1983) (Weinfeld, J.); *United States v. Wilson*, 732 F.2d 404, 407 n. 1 (5th Cir.1984); *see also United States v. Wilson*, 721 F.2d 967, 975 (4th Cir.1983).

In *United States v. Wilson*, 586 F.Supp. 1011 (S.D.N.Y.1983), the defendant was convicted of attempted murder of federal prosecutors, criminal solicitation, obstruction of justice, and tampering with and retaliating against witnesses. Before his trial, the defendant, a former CIA agent, sought to introduce many details of activities during his service with the CIA under CIPA. Defendant Wilson argued that the details of his work for American intelligence "would tend to negate that he had the required intent to commit the crimes charged or a motive to do so." *Id.* at 1014. The trial court found such information regarding details of the defendant's service in the CIA irrelevant and inadmissible with respect to the issues of intent and motivation arising under the charges in the indict-

---

14. The court specifically instructed the jury, in part, as follows:

> If you find that the Defendant was under a reasonable belief that he had legal authority to act with respect to any count charged in the Indictment, or that he had no predisposition to act as charged and would not have done so but for the active encouragement and enticement of Government Agents, then under either such circumstances, you would be required to return a verdict of not guilty.
>
> During the course of the trial, as you know from the instruction I gave you then, you heard evidence that at a time other than the time charged in the Indictment in this case, the Defendant committed acts similar to the acts charged here. You may consider such evidence, not to prove that the Defendant did the acts charged in this case, but only to prove the Defendant's state of mind; that is, whether the Defendant acted as charged in this case with the necessary intent and not through accident or mistake.
>
> \*   \*   \*   \*   \*   \*
>
> The word "knowingly" as that term has been used from time to time in these instructions, means that the act was done voluntarily and intentionally and not because of mistake or accident.
>
> The word "willfully" as that term has been used from time to time in these instructions, means that the act was committed voluntarily and purposely, with the specific intent to do something the law forbids; that is, with bad purpose either to disobey or disregard the law.

> Intent and motive should not be confused. Motive is what prompts a person to act, while intent refers to the state of mind with which the act is done.
>
> So, if you find beyond a reasonable doubt that the acts constituting the crime charged were committed by the defendant voluntarily as an intentional violation of a known legal duty—that is, with specific intent to do something the law forbids—then the element of "willfulness," as defined in these instructions, has been satisfied even though the Defendant may have believed that his conduct was required, or that ultimate good would result from such conduct.
>
> In this respect, it would be no defense to the commission of an unlawful act for a Defendant to rely on what such Defendant perceived to be the apparent authority of Flaherty.
>
> I instruct you that all Agents of the United States intelligence agencies are prohibited by law from violating any statute of the United States. No one may lawfully assert as a valid defense to the violation of a law that he was authorized by an agent of an intelligence agency of the United States to violate the law.
>
> On the other hand, if you have a reasonable doubt as to whether the Defendant acted in good faith, sincerely believing himself to be exempt by the law, then he did not intentionally violate a known legal duty; that is, he did not act "willfully," and that essential part of the offense would not be established.

ment and noted that its determination of admissibility was governed by the Federal Rules of Evidence. In refusing to admit the proffered evidence relating to the defendant's "CIA defense," the trial court stated:

> Whatever the defendant's purpose, the introduction of evidence detailing classified activities will have the tendency to focus attention on what cannot be doubted is the controversial character of foreign intelligence and counter-intelligence operations.... Appeals to the attitudes of jurors by evidence of the alleged unseemly character of American covert activities would divert their attention from the basic issues in this case.... Wilson is the defendant on trial, not the CIA (footnote omitted).

586 F.Supp. at 1016.[15] *See United States v. Sampol*, 636 F.2d 621, 633 n. 31 (D.C.Cir. 1980) ("In light of its dubious probative value, when the testimony began to stray too far afield, the trial court properly refused to 'put the CIA on trial in this case.' "

■ We believe this rationale applies with equal force in this case. Whatever probative value that Carlisle's participation in a prior covert operation had to this case, the admission of evidence regarding the details of those activities would only serve to impermissibly divert the jury's attention away from the basic charges in this indictment. As such, the probative value of that evidence "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury ..." under Federal Rule of Evidence 403.

■ The district court's exclusion of the classified information did not deny the appellants their constitutional right to present a complete defense. Abundant case authority supports the proposition that a defendant's right to present a full and complete defense is not compromised by the requirement that he comply with the established rules of procedure and evidence. *See, e.g., United States v. Bifield*, 702 F.2d 342 (2d Cir.); *cert. denied*, 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983).[16] There are necessary limits to this right and it is axiomatic that a defendant's right to present a full defense does not entitle him to place before the jury irrelevant or otherwise inadmissible evidence.

### III. MULTIPLICITY ISSUE

■ The indictment in this case charges three separate conspiracies. Each of Counts I, II and III charges a violation of the same general conspiracy statute, 18 U.S.C. Sec. 371, but each count charges a different statutory provision as the singular object of that particular conspiracy.[17] Appellants argue that the trial court erred in failing to consolidate or require an election among the three conspiracy counts, and thereafter imposing consecutive sentences upon these multiplicious counts.

This court in *Ward v. United States*, 694 F.2d 654 (11th Cir.1983) directly condemns improper multiplication of conspiracy

---

**15.** On appeal, the Second Circuit affirmed defendant Wilson's convictions before Judge Weinfeld. *United States v. Wilson*, 750 F.2d 7 (2d Cir.1984). Citing the Fifth Circuit's opinion in *United States v. Wilson*, 732 F.2d 404, the court concluded that the trial judge did not err in restricting the defense presentation of evidence which is found to be prejudicial, confusing or misleading under Rule 403. *Wilson*, 750 F.2d at 9.

**16.** As the Second Circuit noted in *Bifield* in discussing a defendant's right to testify in his own defense:

> A defendant's right to present a full defense, including the right to testify in his own behalf, is not without limits. In responding to the charges against him an accused must comply with the established rules of procedure and evidence, as must the prosecution, in order to insure a fair trial.... A criminal defendant's right to present a full defense and to receive a fair trial does not entitle him to place before the jury evidence normally inadmissible.

702 F.2d at 350. *See United States v. Bailey*, 444 U.S. 394, 100 S.Ct. 624, 62 L.Ed.2d 575 (1979).

**17.** Specifically, Count I alleged a conspiracy with the singular object of possessing unregistered firearms; Count II alleged a conspiracy with the singular object of transferring unregistered firearms; Count III alleged a conspiracy with the singular object of selling, converting and disposal of property of the United States, such property being the firearms allegedly possessed under Count I and allegedly transferred under Count II.

counts. There, two conspiracies were charged, both under 18 U.S.C. Sec. 371, one alleging its object as being to violate 18 U.S.C. Sec. 659 "by receiving, possessing and concealing three vehicles which had been embezzled and stolen while being shipped in interstate commerce" and the other alleging its object as being to violate 18 U.S.C. Sec. 2313 "by receiving, storing, bartering, selling and disposing of motor vehicles moving as, and a part of interstate commerce." *Id.* at 660. In condemning this multiplicity of counts, this court utilized reasoning directly applicable here:

"Multiplicity" is the charging of a single offense in more than one count. *United States v. De la Torre,* 634 F.2d 792, 792 (5th Cir.1981); *United States v. Free,* 574 F.2d 1221, 1224 (5th Cir.), *cert. denied,* 439 U.S. 873, 99 S.Ct. 209, 58 L.Ed.2d 187 (1978). Generally, the test for determining whether an indictment is multiplicious is that set forth by the Supreme Court in *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). "Whether each provision requires proof of an additional fact which the other does not." 284 U.S. at 304, 52 S.Ct. at 182; *see United States v. De la Torre,* 634 F.2d at 795; *United States v. Free,* 574 F.2d at 1224. When the charges alleged to be multiplicious are overlapping or similar *conspiracies,* however, the issue is more complex, and depends primarily upon whether the separate conspiracies alleged are each based upon a general federal conspiracy statute, such as Section 371, or instead are based on separate provisions outlawing specific types of conspiracies. * * * ... When, however, the separate conspiracies are both founded upon a general conspiracy statute, the relevant inquiry is whether there existed more than one *agreement* to perform some illegal act or acts. * * * This is true even when the illegal acts supporting each conspiracy alleged are themselves violations of different *substantive* provisions of the criminal code. *United States v. Mori,* 444 F.2d at [240] 243–44 [ (5th Cir.1971) ]. "The single agreement is the prohibited

conspiracy, and however diverse its objects it violates but a single statute [Section 371] of the Criminal Code." *Braverman v. United States,* 317 U.S. [49], 54, 63 S.Ct. [99] at 102 [87 L.Ed. 23 (1942) ]; *see also Albernaz v. United States,* 450 U.S. [333], 339–41, 101 S.Ct. [1137] at 1142–43 [67 L.Ed.2d 275 (1981) ]; *United States v. Di Stefano,* 361 F.Supp. 971, 976 (M.D.Fla.1973). (Emphasis in original).

*Id.* at 660–61.

In this case, the proof at trial revealed an overall agreement, with the same overt acts, covering the same general time frame, to violate various statutory provisions concerning the procurement and sale or transfer of the same government munitions and explosives. Where the gist of the crime is a conspiracy or an agreement to commit one or more unlawful acts proscribed by different statutes, but each count charges a violation of the same general conspiracy statute, and the proof reveals a single ongoing conspiratorial agreement, only a single penalty under that conspiracy statute can be imposed. *Id.; Braverman v. United States,* 317 U.S. 49, 52–54, 63 S.Ct. 99, 101–02, 87 L.Ed. 23 (1942); *see United States v. Marable,* 578 F.2d 151, 153 (5th Cir.1978). This rule differs where the same agreement violates two separate statutes, each of which proscribes a discrete conspiracy. *Albernaz v. United States,* 450 U.S. 333, 339–41, 101 S.Ct. 1137, 1142–43, 67 L.Ed.2d 275 (1981); *Ward,* 694 F.2d at 661.

We conclude that these three Section 371 conspiracies were but the same ongoing conspiracy, both in fact and in law.[18] The appropriate remedy is to vacate all sentences and remand the entire case for resentencing. *See Pennsylvania v. Goldhammer,* 474 U.S. 28, 106 S.Ct. 353, 88 L.Ed.2d 183 (1985) (resentencing to permit court to take into account original sentencing intention after some counts reversed for statute of limitations problems does not violate the Fifth Amendment); *see also United States v. Rosen,* 764 F.2d 763,

---

**18.** The government concedes this point on appeal and agrees that the appellants are entitled

to be sentenced to a single penalty under the conspiracy statute.

765–67 (11th Cir.1985), *cert. denied,* 474 U.S. 1061, 106 S.Ct. 806, 88 L.Ed.2d 781 (1986) (court remanded case for resentencing on entire criminal episode, including counts for which sentences had not been challenged on appeal, in order to give trial judge the opportunity to reapportion sentences to give effect to original sentencing decision); *United States v. Colunga,* 786 F.2d 655 (5th Cir.1986).

For the reasons stated, we VACATE appellants' sentences under 18 U.S.C. Sec. 371, REMAND to the district court for proceedings consistent with this opinion, and otherwise AFFIRM.