[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JAN 10, 2012
JOHN LEY
CLERK

No. 10-14273

_____

D.C. Docket No. 1:09-cr-20964-PAS-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

ALBERTO GRAJALES,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(January 10, 2012)

Before WILSON and FAY, Circuit Judges, and RESTANI,* Judge.

_____

\* Honorable Jane A. Restani, Judge, United States Court of International Trade, sitting by designation.

FAY, Circuit Judge:

After a jury trial, Alberto Grajales appeals his convictions for conspiring and attempting to interfere with commerce by robbery, in violation of 18 U.S.C. § 1951(a); conspiring and attempting to possess with intent to distribute five or more kilograms of cocaine, in violation of 21 U.S.C. § 846; and possessing a firearm in furtherance of a crime of violence and a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A). Grajales raises three issues on appeal. First, he argues that the district court erred when it refused to instruct the jury on his entrapment defense. Second, Grajales argues that the district court erred when it instructed the jury that his honestly held belief that he was helping law enforcement also had to be objectively reasonable in order to negate his specific intent. Finally, Grajales argues that the district court erred when it prevented him from testifying regarding non-hearsay statements that were crucial to his defense. For the reasons set forth below, we reverse.

I.

This case involves an undercover reverse sting operation. The investigation was triggered when a confidential informant, Aliocha Billalba ("CI"), met with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") agents to discuss

information he had obtained regarding Grajales. The CI informed ATF that Grajales had recently expressed an interest in coordinating an armed robbery for multiple kilograms of cocaine. Eventually, Grajales and several other parties attempted to participate in the armed cocaine robbery and were subsequently arrested.

On November 19, 2009, a federal grand jury indicted Grajales. He was charged with conspiring and attempting to obstruct interstate commerce by means of robbery, in violation of 18 U.S.C. § 1951(a); conspiring and attempting to possess with intent to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. §§ 841 and 846; and possessing a firearm in furtherance of these offenses, in violation of 18 U.S.C. § 924(c).

The following facts were submitted into evidence at trial, and we consider the factual background in the light most favorable to the government. United States v. Glen-Archila, 677 F.2d 809, 812 (11th Cir. 1982).

A. Testimony of Government

Grajales's trial began on May 3, 2010. At trial, an undercover law enforcement officer, Detective Juan Sanchez ("Sanchez"), testified that the investigation in this case involved the use of a CI and that the CI initiated all recorded phone calls with Grajales. Prior to his first meeting with Grajales, the CI

called Grajales several times to set up a meeting between them. Although Grajales and the CI arranged a meeting for October 8, 2009, Grajales declined to attend. Therefore, the CI called Grajales and set up a meeting with Sanchez for October 15, 2009.

On October 15, 2009, the CI drove Grajales to the first meeting between Sanchez and Grajales. On the way to the meeting, Grajales asked the CI, "[W]hat's this about . . . .? What merchandise?" The CI responded that it was related to something from the airport. Once Sanchez arrived, Grajales asked Sanchez to explain the situation to him. Sanchez explained that the merchandise involved drugs and that he would be delivering a large shipment of cocaine to a stash house. Grajales questioned whether there were cameras, and even though Sanchez responded "no," Grajales said the job would be easy even if there were cameras. Grajales further questioned whether the goal was to get the money or the cocaine. When Sanchez responded that he did not know whether there would be any money, Grajales explained that "the stuff would be for you" but questioned whether Sanchez was "able to sell it?" Additionally, Grajales explained that he had people that were "pros" and that his guys even had police uniforms that they could use to commit the robbery.

Subsequently, the CI arranged two additional meetings. The CI arranged

the second meeting between the CI, Sanchez, and Grajales for October 26, 2009. A member of Grajales's crew, Barrera-Avila, was also present. At this meeting, Sanchez explained that a shipment of cocaine was arriving the following week. The CI arranged the third meeting between Sanchez, the CI, Grajales, and Barrera-Avila for November 3, 2009. During the third meeting, Sanchez informed Grajales and Barrera-Avila that the delivery of the cocaine shipment would take place the following day. Grajales and Barrera-Avila agreed to go forward with the armed robbery and stated that they would be bringing three other individuals to assist in committing the robbery. They further explained that, after the robbery, all of the participants would meet at Grajales's house.

On November 4, 2009, the day of the planned robbery, the CI called Grajales. During this phone call, Grajales advised the CI that he was concerned that his crew was going to steal from him, and therefore he wanted to bring in an additional person for protection. On the same day, the CI placed another phone call to Grajales and advised him to meet at a shopping center to execute the robbery.

Subsequently, Grajales arrived at the location, entered the CI's vehicle, and proceeded to a predetermined location. While Grajales was in the CI's vehicle, he called someone on the phone and offered him $10,000 to $15,000 if he could get a

5

car and meet Grajales.  Grajales also spoke with the CI and told him that the scheme "better not be a fairytale."  After speaking with the CI, Grajales called the additional person he wanted for protection and explained to him that the plan was a "sure thing."  However, when Grajales and the CI arrived at the predetermined location, Grajales observed law enforcement and informed the person on the phone: "Listen, wait.  This, this was a trap, wait."

At the close of the government's case-in-chief, Grajales moved, pursuant to Federal Rule of Criminal Procedure 29, for judgment of acquittal on all five counts of the indictment.  Grajales argued, in part, that there was entrapment as a matter of law based on the persistent contact between the CI and Grajales.  In support of this argument, Grajales noted that the CI had called him approximately fifty times prior to November 4, 2009, while Grajales had called the CI approximately six times.  He further argued that, prior to the first meeting with Sanchez, Grajales did not know that the plan involved cocaine and initially stated that he did not want any cocaine.  The district court held that it was inappropriate to consider entrapment as a defense at the close of the government's case-in-chief.

B.  Grajales's Testimony

In his defense, Grajales elected to testify at trial.  From the start of his testimony, there was some question over whether the district court would allow

Grajales to testify to statements made to him by the CI that allegedly induced his participation in the scheme. When defense counsel asked Grajales what the CI told him to compel his involvement, the government objected on hearsay grounds. Defense counsel explained that the statements were not offered for the truth of the matter asserted but rather to show what Grajales believed. The court initially overruled the objection but then held a side-bar discussion. After the government argued that Grajales could be asked what he believed but not what someone else told him, the court sustained the objection and directed counsel to rephrase the question.

Grajales then explained his relationship with the CI. He testified that he knew the CI for almost four years. Beginning in May 2009, the CI repeatedly approached Grajales and attempted to enlist his involvement in various robberies and burglaries. However, Grajales testified that he repeatedly declined to participate.

Grajales further testified that, on September 30, 2009, the CI approached Grajales again and explained to him that he had avoided a ten-year sentence for drug trafficking and was released from prison after a year because he cooperated with the government. The CI further explained that he decided to work as a paid informant for the police. Grajales then asked the CI to introduce him to the police

officers. Following this testimony, the government asked for a side-bar.

At the side-bar conference, the government argued that this testimony went to a public authority defense, and the defendant had not notified the government of such a defense. Defense counsel responded that the testimony was relevant to the entrapment defense, as well as to whether Grajales had the intent to commit the crime. After further discussion, the district court instructed the jury that Grajales was not authorized to work on behalf of law enforcement.

Grajales's testimony resumed, and he continued to attempt to explain that he knew about the sting operation. However, the government objected to testimony by Grajales involving statements made to him by the CI regarding why the CI would not take him to meet with law enforcement; what was said to Grajales to compel his involvement after the CI declined to introduce him to law enforcement; the guarantee made to Grajales by the CI that nothing would happen to him; and the conversation Grajales had with the CI regarding the CI allegedly requesting that Barrera-Avila participate in the robbery. The district court sustained the government's objections, and disallowed Grajales to testify on these issues.

Despite the court sustaining the government's objections, Grajales managed to explain that the CI told him that he could not meet with the police because the CI was not yet working with them directly, and therefore the CI swore

8

on photographs of his own children as a guarantee that nothing would happen to Grajales. Further, although he was prevented from testifying to what the CI told him to compel his involvement after the CI declined to introduce him to law enforcement, Grajales did testify to what he believed. Grajales testified that he believed the CI had only served one year of his ten-year sentence, and therefore he believed the CI was working for law enforcement. Finally, while Grajales was excluded from testifying to his conversation with the CI regarding Barrera-Avila's participation, he did testify that it was the CI's idea to involve Barrera-Avila.

Subsequently, Grajales testified about how he learned about the operation and his reasons for participating in it. Grajales testified that the CI informed him that Sanchez was a police officer and that he should play along with the scenario Sanchez presented. Grajales believed that, if law enforcement learned that he knew about the operation, the operation would fail. Additionally, he participated in the operation because he wanted to help the CI, and he believed that Barrera-Avila had previously set fire to two of his cars.

Grajales then testified to his thoughts after conversations he had with the CI that were not recorded. Grajales thought that no actual cocaine would be involved and that he would not be arrested. He thought that, when he and the CI were arrested, the CI would explain to law enforcement Grajales's involvement.

9

However, the district court sustained the government's hearsay objections to defense counsel's attempts to ask Grajales whether he: (1) tried to explain his arrangement with the CI to the police when he was arrested; (2) told the police to get cameras from his home, which he allegedly set up because he believed it would help him to confirm that he was working with police; and (3) asked the police to bring the CI into the interrogation room after Grajales was arrested.

At the end of Grajales's testimony, he explained that he knew there were no drugs, but asked questions because he had to play along. Grajales maintained that his phone calls to the other participants were part of the ruse. He further avowed that, before the CI contacted him, he had never wanted to commit a home invasion robbery, possess cocaine, or distribute cocaine. The CI asked him countless times, and he told him no every time he asked.

C. Jury Instructions

Following Grajales's testimony, the district court refused, over Grajales's objection, to charge the jury on entrapment. The court concluded that there was not even a scintilla of evidence that there was mild coercion. Defense counsel objected, arguing he presented enough evidence for an entrapment instruction. Nevertheless, the district court refused to instruct on the entrapment defense, but stated that it would instruct the jury on a lack of *mens rea* defense. Grajales

10

objected to the instruction because it required his belief that he was working for law enforcement to be both honestly held and objectively reasonable. The district court overruled Grajales's objection and instructed the jury as follows:

> If you find . . . that the defendant had the honest and reasonable belief that he was performing the criminal acts with which he is charged to help law enforcement, in other words that he did not have the specific intent to commit the crimes charged, then you would be required to return a verdict of not guilty.

The court further instructed the jury that the defense of entrapment was not a defense.

## II.

"We have long held that the sufficiency of the defendant's evidence of government inducement is a legal issue to be decided by the trial court." United States v. Sistrunk, 622 F.3d 1328, 1332-33 (11th Cir. 2010). And, just as in Sistrunk, we do not need to make a determination of the standard here—whether a *de novo* or abuse of discretion standard applies—because under either standard the result is the same. We similarly review jury instructions *de novo* to determine whether they misstated the law or misled the jury. Brochu v. City of Riviera Beach, 304 F.3d 1144, 1155 (11th Cir. 2002).

We review for abuse of discretion a district court's evidentiary rulings, United States v. Docampo, 573 F.3d 1091, 1096 (11th Cir. 2009), and we review

11

*de novo* constitutional claims. United States v. Nash, 438 F.3d 1302, 1304 (11th Cir. 2006) (per curiam).

III.

Grajales first argues that the district court erred by refusing to instruct the jury on his entrapment defense, and instead, directing a verdict on that defense. Specifically, he argues that he merited an entrapment defense because he met his burden of producing sufficient evidence of government inducement through his own testimony. Moreover, he contends that the government's evidence also supported his requested instruction. We agree.

Entrapment is an affirmative defense. United States v. Orisnord, 483 F.3d 1169, 1178 (11th Cir. 2007). "There are two elements to an entrapment claim: (1) government inducement of the crime and (2) the defendant's lack of predisposition to commit the crime before the inducement." Id. As entrapment is an affirmative defense, the defendant bears the initial burden of producing evidence that is sufficient to raise a jury issue on the question of whether the government's conduct created a substantial risk that the offense would be committed by a person other than one ready to commit it. Id.

The defendant will be considered to have met this burden if he produces

evidence that the government's conduct included some form of persuasion or mild coercion.  United States v. Brown, 43 F.3d 618, 623 (11th Cir. 1995).  The defendant "may make such a showing by demonstrating that he had not favorably received the government plan, and the government had to 'push it' on him or that several attempts at setting up an illicit deal had failed and on at least one occasion he had directly refused to participate."  United States v. Andrews, 765 F.2d 1491, 1499 (11th Cir. 1985) (internal citations omitted).  Moreover, "the government's evidence can provide this requisite evidentiary base for an entrapment instruction, and [the] failure to give an instruction when the defendant has met his burden is reversible error."  United States v. Bagnell, 679 F.2d 826, 834-35 (11th Cir. 1982) (citing United States v. Timberlake, 559 F.2d 1375, 1379 (5th Cir. 1977) (internal citation omitted)).

Here, Grajales met his burden of producing sufficient evidence of government inducement both through his own testimony and the government's evidence.  Grajales testified that it took the CI months to get him to participate in the robbery, and that before the CI contacted him, he never wanted to commit a home invasion robbery, possess cocaine, or distribute cocaine.  Beginning in May

2009,[1] the CI constantly called him and showed up at his house soliciting his participation in various home invasion robberies, which he repeatedly declined. This testimony provides some evidence that Grajales had not favorably received the government's plan, and therefore it had to "push it" on him.

As to the government's evidence, Sanchez testified that the CI initiated all recorded phone calls with Grajales and that the CI set up all of the meetings with Grajales. The CI called Grajales fifty times between October 5, 2009, and November 4, 2009, while Grajales placed six calls to the CI.[2] Additionally, the government's evidence established that on one occasion Grajales had refused to participate in the scheme. Sanchez testified that Grajales failed to attend the first scheduled in-person meeting that the CI and Sanchez set up. Based on this evidence, a reasonable jury could infer that Grajales missed this meeting because

[1] The government argues that any alleged propositions prior to October 2009 were not sponsored by the government. We disagree. A government's witness, Espinosa, testified that the CI approached him about Grajales in June 2009. Furthermore, the transcripts of the October 5th phone call reveal that Grajales already appeared to be familiar with the deal the CI was arranging. This suggests the CI told Grajales about the plan prior to the phone call, and therefore the CI was working with Grajales prior to October 5, 2009. In engaging the CI, the government sponsored this plan, including its inception.

[2] The number of phone calls are taken from defense counsel's arguments during his motion for judgment of acquittal. At that time, defense counsel explained that the evidence of the calls were taken from Agent Stith's report. Agent Stith, a government witness, testified at trial to phone records for both Grajales and the CI. The government does not contest that the number of calls made by the CI vastly outnumbered the calls made by Grajales.

14

he was having second thoughts about going through with the CI's proposed scheme.[3] Mathews v. United States, 485 U.S. 58, 63 (1988) (holding the defendant is entitled to an entrapment instruction when sufficient evidence exists from which a reasonable jury could find entrapment). Nevertheless, the CI contacted Grajales once again and set up another meeting for him to attend with Sanchez and the CI. Furthermore, prior to the first meeting, Grajales did not know that the deal involved cocaine and initially stated that he did not want any cocaine.

Based on the evidence at trial—both from Grajales and the government— Grajales was entitled to have the jury instructed on entrapment. Grajales met his burden of presenting sufficient evidence that the government did not merely provide him with an opportunity to commit the crime, but rather coerced him into committing the crime. Accordingly, the district court erred when it failed to give the jury an entrapment instruction, and the failure to give the instruction constitutes reversible error.[4] Bagnell, 679 F.2d at 834-35.

---

[3] Although the government argues that Grajales did not attend the first meeting because the evidence established that he had drunk a beer, this determination is for the jury.

[4] It is important to note that the district court appears to have denied Grajales an entrapment instruction, at least in part, because an entrapment defense conflicted with his claims that he knew he was participating in a government sting operation. This Court has held that the defendant is entitled to have the jury instructed on his theory of defense even if the evidence supporting the theory is "weak, insufficient, inconsistent, or of doubtful credibility." United States v. Opdahl, 930 F.2d 1530, 1535 (11th Cir. 1991) (citation omitted). Thus, to the extent that the district court refused to instruct the jury on entrapment merely because such a theory of defense was inconsistent with his claims that he lacked the specific intent to commit the charged

IV.

Although we find Grajales's arguments on entrapment dispositive, we note that Grajales's next argument—that the district court erred when it instructed the jury that his honestly held belief that he was helping law enforcement also had to be objectively reasonable—has merit.

During trial, Grajales objected to the following instruction:

> During the trial I have instructed you that as a matter of fact and law the defendant was not authorized by law enforcement to perform the acts with which he is charged. To work with law enforcement and engage in undercover actions requires special approvals which the defendant did not have.
>
> If you find, however, that the defendant had the honest and reasonable belief that he was performing the criminal acts with which he is charged to help law enforcement, in other words that he did not have the specific intent to commit the crimes charged, then you would be required to return a verdict of not guilty.

His objection was overruled. Grajales now argues that the district court erred by including the term "reasonable" in the second paragraph of this instruction because the first four counts of the indictment charged inchoate conspiracy and

---

crimes, the district court's refusal was erroneous. Mathews, 485 U.S. at 65 (holding a defendant may testify that he lacked intent while also arguing that, if the jury concludes otherwise, then it should consider whether his intent was the product of government inducement).

16

attempt crimes, and therefore his honest belief that he was assisting law enforcement precludes a finding of guilt.

Given that the indictment charged Grajales with conspiracy and attempt crimes, we must consider the elements of each crime. In order to prove an attempt crime, the government must show that the defendant: (1) had the specific intent or *mens rea* to commit the underlying charged crimes; and (2) took actions that constituted a substantial step toward the commission of each crime. United States v. Yost, 479 F.3d 815, 819 (11th Cir. 2007) (per curiam). For conspiracy, the government must prove an agreement between two or more persons to commit a crime, the defendant's knowledge of the conspiratorial goal, and the defendant's voluntary participation in furtherance of the conspiracy. United States v. Jones, 913 F.2d 1552, 1557 (11th Cir. 1990). Specific intent to join the conspiracy is also a necessary element of proof. United States v. Prince, 883 F.2d 953, 957 (11th Cir. 1989).

Because the government must prove that the defendant possessed the *mens rea* of specific criminal intent, "[s]everal defenses may apply when a defendant claims he performed the acts for which he was charged" on behalf of the government. United States v. Baptista-Rodriguez, 17 F.3d 1354, 1368 n. 18 (11th Cir. 1994). These defenses include "innocent intent" and "public authority." Id.

17

Innocent intent is when the defendant lacked criminal intent because "he honestly believed he was performing the otherwise-criminal acts in cooperation with the government." Id. The defense of "public authority," on the other hand, permits "exoneration based on the fact that [the defendant] reasonably relied on the authority of a government official to engage him in a covert activity." Id. (citing United States v. Anderson, 872 F.2d 1508, 1513 (11th Cir. 1989)).

Reviewing the jury instruction in this case, we agree that the district court erred when it instructed the jury that Grajales's mistaken belief that he was helping law enforcement had to be reasonable. When the district court imposed the requirement that Grajales's belief be reasonable, the district court confused the standards applicable to the innocent intent and public authority defenses, even though Grajales informed the court that he was not relying on a public authority defense. The defense of "innocent intent" is a subjective test, requiring an honestly held belief. Baptista-Rodriguez, 17 F.3d at 1368 n.18. Accordingly, the district court erred when it instructed the jury on "innocent intent" because a reasonable belief is not required.[5]

_____

[5] The district court relied on Anderson when formulating its jury instruction. In Anderson, this Court quoted the district court's jury instructions in a footnote. Id. at 1518 n.14. Although the quoted instruction stated that, if the jury found "the Defendant was under a reasonable belief that he had legal authority to act" then the jury had to return a verdict of not guilty, the instructions further stated that, if the "Defendant acted in good faith, sincerely

18

We similarly note that Grajales's last argument has merit. Grajales argues that various evidentiary rulings by the district court violated his constitutional right to present a defense and to testify in support of that defense. Specifically, he argues that the district court erred in excluding the following statements as hearsay: (1) statements the CI made after Grajales asked to be introduced to law enforcement officers; (2) the substance of the guarantees the CI made to him during the course of the investigation; (3) the statements the CI made to convince Grajales to involve Barrera-Avila in the scheme; and (4) statements Grajales made to police regarding his agreement with the CI, his attempt to have the CI brought into the interrogation room, or his attempt to tell police about his security cameras.

Federal Rule of Evidence 801(c) defines hearsay as a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence "to prove the truth of the matter asserted in the statement." Thus, an out-of-court statement is not hearsay if it is offered for some purpose other than to

---

believing himself to be exempt by the law, then he did not intentionally violate a known legal duty." Id. Most importantly, this Court held the instruction was not in error because the instruction stated that the jury should acquit if it had "a reasonable doubt whether the defendants acted in good faith under the sincere belief that their activity was exempt from the law." Id. at 1517-18. Therefore, Anderson does not require that the defendant's belief be reasonable to show that he did not act willfully.

prove the truth of the matter asserted. <u>United States v. Schlei</u>, 122 F.3d 944, 981 (11th Cir. 1997) (evidence regarding witness's testimony at her deposition was not hearsay where testimony was offered to demonstrate defendant's state of mind). Furthermore, using an out-of-court statement "as circumstantial evidence of the declarant's knowledge of the existence of some fact, rather than as testimonial evidence of the truth of the matter asserted, does not offend the hearsay rule." <u>United States v. Parry</u>, 649 F.2d 292, 295 (5th Cir. Unit B June 1981).[6]

None of Grajales's testimony regarding out-of-court statements fell within the hearsay definition of Rule 801(c). Grajales was attempting to testify to statements that were not being offered for their truth. Rather, the statements the CI allegedly made were offered to explain what Grajales believed and why he acted as he did, and the statements he made to law enforcement were offered as circumstantial evidence of his state of mind. Through his testimony, Grajales sought to establish that he knew that Sanchez was an undercover officer and was merely assisting law enforcement during the operation.

Although Grajales managed to testify to some of the statements the district court had excluded, the district court prevented Grajales from testifying to what

---

[6] <u>Parry</u> is binding on this Court pursuant to <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

20

the CI told him to compel his involvement after the CI declined to introduce him to law enforcement. Rather, Grajales had to testify to what he believed, and therefore Grajales explained that he believed the CI was working for law enforcement because the CI only served one year of his ten-year sentence. Further, Grajales was precluded from testifying to several statements he made to law enforcement when he was arrested. With those constraints on his testimony, he could not explain his actions or corroborate his testimony, which is relevant to his honestly held belief that he was assisting law enforcement.

Because Grajales argued that he honestly believed that he was working for law enforcement, the jury was entitled to consider the CI's statements and Grajales's reaction to them to resolve the issue of specific intent. Thus, the district court erred in excluding the above statements as hearsay because the statements were not being offered for their truth and were relevant to whether Grajales possessed the *mens rea* of specific criminal intent.

## VI.

Given the error by the district court, as discussed above, we reverse and remand for a new trial.

**REVERSED AND REMANDED FOR A NEW TRIAL.**